UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NIKOLAS TAMEZ, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | JURY DEMANDED |
| SERGEANT CONSTRUCTION, INC., | ) | |
| Defendant. | ) | |

## COMPLAINT

NOW COMES, the Plaintiff NIKOLAS TAMEZ ("Plaintiff"), by and through his attorneys, Kreitman Law, LLC, complaining of the Defendant, SERGEANT CONSTRUCTION, INC. ("Defendant"), and states as follows:

## PARTIES

1.     At all times relevant to this Complaint, Plaintiff was a citizen of the State of Indiana.

2.     At all times relevant to this Complaint, Plaintiff's race was Hispanic.

3.     At all times relevant to this Complaint, Plaintiff's skin color was light brown.

4.     At all times relevant to this Complaint, the Defendant was an Illinois corporation, and operated a construction business in the Chicagoland area with a primary office located at 19027 Jodi Road, Unit G, Mokena, Illinois 60448.

## JURISDICTION AND VENUE

5.     This Court has federal question jurisdiction arising under the Family Medical Leave Act, 29 U.S.C.A. § 2601, *et seq.*, as modified by the Emergency Paid Sick Leave Act ("EPSLA"), Division E of the FFCRA §§ 5101–5111.  This Court also has federal question jurisdiction arising from 42 U.S.C.A. § 1981*, et seq.*

6.      Further, this Court has diversity jurisdiction over the Plaintiff's claims pursuant to 28 USC § 1332, as Plaintiff and Defendant are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

7.      Venue is properly placed in this District because the Defendant is transacting business in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District pursuant to 28 U.S.C. §1391(b)(2) and (3).

## GENERAL ALLEGATIONS

8.      On or about August 24, 2020 until March 8, 2021, Plaintiff was employed by Defendant as a carpenter/working foreman.

9.      At all times material to this Complaint during Plaintiff's employment, Plaintiff's direct foreman and supervisor was Tyrone Robinson ("Mr. Robinson").

10.     At all times material to this Complaint, Mr. Robinson's race was African American and his skin color was dark.

11.     At all times material to this Complaint, Defendant was owned by Rick Ringold ("Mr. Ringold").

12.     At all times material to this Complaint, Mr. Ringold's race was African American and his skin color was dark.

13.     Consistently during his employment with Defendant, Plaintiff was disrespected, demeaned and discriminated against because of his lighter skin color and Hispanic race by Mr. Robinson.  Ultimately this led to Plaintiff being placed in unsafe situations and injuring Plaintiff.

14.     At various worksites, Mr. Robinson would consistently speak about lighter skinned people being treated better and about their privilege.

15.     In September 2020, at a worksite in Danville, Illinois, Plaintiff asked Mr. Robinson not to leave tools on a ladder because it posed a hazard.  Mr. Robinson acknowledged and disregarded Plaintiff because of his Hispanic race and lighter skin color.

16.     Plaintiff was then injured when a 2x6 wooden board fell from a ladder moved by Mr. Robinson and struck him in the head.

17.     On or about September 22, 2020, at a worksite in Crestwood, Illinois, Plaintiff was asked a question about dust by a female employee of the Illinois Armory where the work was being done.  Mr. Robinson did not hear the conversation, and instead immediately came over and reprimanded Plaintiff for harassing the woman.  This reprimand was because of Plaintiff's Hispanic race and color.

18.     On or about September 23, 2020, Christopher Chandler, the superintendent sent Plaintiff a warning email based upon Mr. Robinson's false report.  When Plaintiff contested it, Mr. Chandler told Plaintiff to not bother him anymore with "petty bullshit".

19.     At the rest of the Crestwood, Illinois worksite, Mr. Robinson would repeatedly require Plaintiff to work harder than himself or LJ Easter, an African American laborer, due to the Plaintiff's Hispanic race and color and send Plaintiff home early while Mr. Easter would be kept on the site.

20.     On October 8, 2020, Plaintiff began being symptomatic with COVID-19, with cold sweats, sore throat and lost his sense of taste.

21.     October 9, 2020, Plaintiff took a COVID-19 test and tested positive.

22.      On October 10, 2020, Plaintiff called Mr. Chandler to report his positive COVID-19 diagnosis and symptoms.  On this call Plaintiff also complained to Mr. Chandler about Mr.

Robinson sending him home and told Mr. Chandler that he believed he was treated differently due to his race by Mr. Robinson because he was not African American.

23.     Plaintiff thereafter submitted medical documentation of his positive COVID-19 diagnosis and was placed on unpaid leave.

24.     Plaintiff was on unpaid COVID-19 leave and until November 9th, 2020, when Plaintiff returned to work.

25.     On or about November 30ᵗ 2020, through on or about the third week of December 2020, Plaintiff was working at a worksite for Defendant in Danville, Illinois.

26.     Prior to the Danville, IL, site, Plaintiff's rate of pay was $82.91 per hour.

27.     Plaintiff worked from around November 30, 2020, to around the third week of December 2020 without notice of a pay rate change.

28.     Around the third week of December 2020, Plaintiff discovered that his pay rate had been changed by Defendant to $57.38 per hour and that all hours worked from about November 30, 2020, through around the third week of December 2020 at the Danville, IL worksite was paid at $57.38 per hour.

29.     When Plaintiff discovered the lowered rate of pay and addressed it with the Defendant, he was told that the $57.38 per hour rate of pay was correct for the Danville, IL, project as he was supposed to be paid the prevailing wage for the area and that his hours he worked before were overpaid.  Defendant refused to pay the differential to Plaintiff for the hours worked on the Danville, IL project.

30.     Mr. Easter's rate of pay was not adjusted to the lower pay prevailing wage rate on the Danville, IL, project.

4

31.     In November 2020, Plaintiff began working a job for Defendant at the Jesse Brown VA Medical Center, with a main campus located at 820 South Damen Avenue, Chicago, IL 60612 ("Jesse Brown VAMC worksite").

32.     On or about January 12, 2021, Mr. Robinson removed help from Plaintiff during demolition work telling him he could work by himself as he was "young" and did not require Mr. Easter to perform the same work or perform the same work himself without help.  The following day Mr. Robinson required Plaintiff to demolish brick walls without adequate facemasks rated for silica dust and ignored Plaintiff's request for such a face mask.

33.     On or about January 15, 2021, Mr. Robinson again made Plaintiff continue shoveling brick alone, which he did not require Mr. Easter or himself to do without assistance. Towards the end of the shift, Plaintiff's arm began to cramp and Plaintiff began to have a severe headache due to the inhalation of brick dust.  Plaintiff requested to take a lunch break to Mr. Robinson.  Mr. Robinson lied to Plaintiff and said that Mr. Chandler ordered him off of the worksite.  Plaintiff called Mr. Chandler who said that Mr. Robinson had reported Plaintiff was "bitching" all night and sent Plaintiff home for the evening.

34.     On February 22, 2021, Plaintiff was working at the Jesse Brown VAMC worksite and observed a hallway full of brick dust due to Defendant's interior demolition.  Plaintiff took photos of the dust.  Pipefitters, not affiliated with Defendant asked Plaintiff to turn the HEPPA Filer back on.  Plaintiff was unsure why the air filter was turned off and asked his Mr. Easter and Mr. Robinson why the air filter had been turned off.  Mr. Robinson told Plaintiff that the air filter was turned off because it would not allow the saw to operate when turned on.  Plaintiff suggested wetting the walls to decrease the dust to Mr. Robinson and was ignored due to Plaintiff's Hispanic

race and lighter skin color. Plaintiff then changed the air filter pads on the air filter and turned it back on.

35. Plaintiff then included photos of the dust and a description of what happened to Mr. Chandler.

36. Below is a true and accurate a copy of the text message from Plaintiff to Mr. Chandler:

Daily report
Jesse brown 2-22-2021
Start time 10 pm
End time 5:30am


Pipe-fitters
start time 9:30pm
End time 5:30am


10:15 pm Tyrone said to mop nurses hallway to get rid of the dust.
Tyrone and LJ stayed trying to cut out the wall on the other side of the
nurses hallway.  I spoke to a mr. Williams with EMS.  He gave me the
wet floor signs.  Told me to leave them on the side of the hallway when
finished.  After I finished swiffering the nurses hallway at 10:45 pm I
began sweeping the main corridor hallway. At 11:10 pm I came back
inside the work area and it was completely cloudy in there. Full of dust.
I took pictures of the smoke.  The pipe fitters asked if I could turn the
Heppa filter back on. Not sure who's idea it was to turn off the HEPPA
FILTER  so I asked LJ and Tyrone why the filter was off.  I was told the
saw couldn't work with it on.  They had the shop vac hooked up to the
saw but it didn't do anything to help with dust. They also had the fan
blowing instead of the HEPPA filter. I suggested wetting the wall with
water to kill some of the dust.   I was ignored So I immediately changed
the pads in the filter and turned it back on.  Some of the workers were
not happy with how bad the dust was.  After the dust died down  LJ and I
began breaking the lower section of the brick wall. The electricians LEFT
AROUND MIDNIGHT The pipe-fitters continued to install and weld pipes.
@12:48 am. Cliff (Pipefitter notified me that one of the outlets blew a
fuse.  No longer works and I'm not sure where the main is at. Tyrone told
LJ to stop working at 1:30. And clean up.    We were only able to take out
a very small section. Of the lower half of the wall. We need a jack
hammer.  Either a 15Lbs or 30lbs would definitely get the job done faster
and more efficiently. There's plaster, then 2 courses of brick staggered

then a foundation concrete wall behind that.  We finished cleaning up at 1:50 am.  I took my lunch break with pipefitters at 2 am.  I returned from lunch at 2:30 am  and began chiseling out the bricks from the wall that has to be removed.  I started at the top and seem to have more progress than starting at the bottom.  I continued to remove brick and haul the debris to the dumpster until it was time to clock out.

Side note:

 I could use a mop Bucket with a ringer and new industrial mop head Also chemicals for the mop to clean the hallway where the nurses station is at.  The swifter didn't do a good job.

Also need Clorox wipes , some bathroom cleaning spray like kaboom. and any disinfectant spray to clean the bathroom

I need large rubber gloves.  Preferably the nitrile latex free .

And lastly I need construction contractor bags.

I can pick this material up if I need to. Just wanted to make sure first prior to purchasing.





37.     On February 24, 2021, Plaintiff was working at the Jesse Brown VAMC worksite for Defendant.

38.     On this day, Mr. Robinson had left a hammer on top of a ladder during demolition work inside a doctor's private bathroom after working on the ceiling.

39.     When Plaintiff attempted to move the ladder, the hammer fell and struck him in the shoulder.

40.     Plaintiff informed Mr. Easter about the injury and asked why Mr. Robinson left the hammer on the ladder.  Mr. Robinson then reentered the room and stood silently after apparently listening to the conversation.

41.     Plaintiff then began resuming demolition of a doorframe while Mr. Robinson stood in the room.

42. Above the doorframe there was a few feet of drywall extending to the ceiling, but the drywall did not run to the doorframe.

43. Shortly thereafter a loose steel stud left apparently lodged by a prior contractor in the drywall above the doorframe fell from the area fell and struck Plaintiff on his nose.

44. Plaintiff lost his balance and Mr. Easter caught him. Plaintiff began bleeding and suffered a concussion. As Plaintiff began grunting in pain and remarking he was bleeding, Mr. Easter began laughing and asked Plaintiff "how he did that".

45. Plaintiff explained what happened to Mr. Robinson and Mr. Robinson told him to put a "band-aid" on it.

46. Plaintiff went to the bathroom and applied Neosporin and placed a band-aid on the laceration. Plaintiff told the Mr. Chandler about the injury, and said he did not feel well, that he likely needed stitches for the cut and that his head was pounding.

47. Mr. Chandler laughed and told Plaintiff to take a break and sit tight.

48. Plaintiff then asked for fresh air and walked outside.

49. Plaintiff returned and his headache had become much more severe.

50. Plaintiff texted Mr. Chandler that he needed to see a doctor.

51. Plaintiff saw that his text did not go through and found Mr. Chandler in the building and told him he needed to see a doctor.

52. Mr. Chandler told Plaintiff not to use the Jesse Brown VAMC emergency room and complained that now he had to "fill out paperwork".

53.     Mr. Chandler permitted Plaintiff to leave the worksite to obtain medical treatment near his home in Indiana, but not at Jesse Brown VAMC, the closest emergency room, and told him to send photos of the injury and to tell him how "it goes".

54.     That day, Plaintiff obtained medical treatment at the St. Mary emergency room department in Hobart, Indiana.

55.     The following morning, on February 25, 2021, Plaintiff texted Mr. Chandler photos of the injuries, another explanation of what had occurred and a copy of a work restriction through February 27, 2021 from the St. Mary Emergency Department.  Two hours later after no response, Plaintiff asked Mr. Chandler to speak on the phone.

56.     Plaintiff then called Mr. Chandler and asked if he was in trouble or would lose his job because of his injury.  Mr. Chandler said no but then complained that the insurance would increase, complained again he would have to complete OSHA paperwork and said it was a four-million dollar job "you do the math".  Mr. Chandler then remarked to the effect to let him know how things go because it can't be the same person getting hurt all the time.  Plaintiff interpreted this to possibly refer to his prior complaints about brick dust.  Plaintiff asked Mr. Chandler what he meant, and Mr. Chandler said he would talk to him later and hung up.

57.     On February 26, 2021, Plaintiff inquired to Mr. Chandler regarding his hours and it didn't appear he was paid for the eight hours worked on February 22, 2021.

58.     On March 1, 2021, Plaintiff saw neurologist Olga Kozlova, M.D., who diagnosed Plaintiff with a facial laceration, mild TBI, a shoulder injury and cervical injury/cervical radiculopathy from the February 24, 2021, incident.  Dr. Kozlova referred Plaintiff to Dr. Salehi for management of the cervical injury, ordered an MRI of the cervical spine and placed Plaintiff

on work restrictions. Plaintiff forwarded the notes and work restriction to Mr. Chandler and to Mr. Ringold.

59. On March 1, 2021, March 2, 2021 and March 3, 2021, Mr. Chandler messaged Plaintiff that there was no work.

60. On March 3, 2021, Plaintiff messaged Mr. Chandler to inform him his check did not include the eight hours of work performed on February 22, 2021. Mr. Chandler did not respond.

61. On March 3, 2021, Plaintiff received an email from Mr. Ringold to call him as there were things he wanted to discuss. Plaintiff replied and asked when would be a good time and Mr. Ringold did not respond.

62. On March 4, 2021, Plaintiff called Mr. Ringold. They discussed Plaintiff's injury and what happened on February 24, 2021. Mr. Ringold then told Plaintiff that a worker's compensation claim would set the company back financially and said if there was a way to handle the injury outside of workers compensation claim he would prefer it.

63. Mr. Ringold then inquired if he could run a crew of concrete finishers for a job a federal prison. Plaintiff said he could, and Mr. Ringold began asking about what the doctors told him. Plaintiff stated he could work on light duty, and that the neurologist estimated it would be about a month due to the concussion he sustained.

64. Mr. Ringold said that they really did not have any light duty work but could nonetheless give Plaintiff work in the office. He stated that he wanted to compensate Plaintiff for the time off and reach a settlement. Plaintiff raised the issue of the unpaid day on February 22,

2021 and Mr. Ringold agreed to take care of it. Mr. Ringold said he would take of Plaintiff

financially, then pivoted and said to the effect "with that being said do you feel like you have to

go through workman's comp?" Plaintiff felt intimidated and stated he did not want to but that he

had to make sure there were no serious injuries. Mr. Ringold said that's fine, and asked Plaintiff

to meeting on Monday March 8, 2021. Plaintiff agreed and hung up the phone.

65.     Plaintiff then called Mr. Ringold again and asked if he could meet with him sooner

to discuss the racial harassment from Mr. Robinson. Respondent said yes he could meet on March

5, 2021 but it would have to be early.

66.     Plaintiff discovered he could not make the March 5, 2021 meeting and called Mr.

Ringold to reschedule. Mr. Ringold said come in March 8, 2021 and then angrily mentioned he

received a call about Plaintiff's workers compensation claim, Plaintiff responded with "okay" and

Mr. Ringold hung up.

67.     On March 8, 2021, Complaint met with Mr. Ringold at Defendant's office. Plaintiff

sat down in an office with Mr. Ringold who was visibly unhappy and silent. Plaintiff began by

stating Mr. Ringold how they should deal with the situation as he never had a work injury before,

and said that he was heavy hearted about the situation as he did love his job and appreciated the

opportunity to work with Defendant.

68.     Mr. Ringold then replied that he had never dealt with this either and discussed with

his wife how to proceed. Mr. Ringold then said his wife suggested that they settle any issues before

going to "court" because worker's compensation would hurt them financially.

69.     Mr. Ringold also said that having an injury on their worksite reported would lead

to points against the company and that it will be a public record against Plaintiff that will hurt

Plaintiff's future in the construction industry since his recorded injury would follow him permanently.

70.     Plaintiff explained that after he was hurt his brother referred him to a worker's compensation attorney.  Mr. Ringold interrupted and said that changes things as he would have to get an attorney as well.

71.     Mr. Ringold then remarked that you don't always like the people your work with, and Plaintiff was surprised, and agreed.  Mr. Ringold then said to the effect "well go through worker's comp and we can agree on some type of settlement and if you don't go through with it, we can work out some numbers.  If you do go through with it then, I'm not saying I'm an attorney or anything but there wouldn't be any work for you."

72.     Plaintiff said he was sorry he felt that way, but that he was hurt and was not using worker's compensation to get rich, and that it was his right to report his injury and apply for worker's compensation due to the injury.  Plaintiff said he will continue to try to go above and beyond for the company because it had been so good to him.  Plaintiff informed Mr. Ringold that he had a few more doctor appointments and will let him know how it goes and the meeting ended.

73.     On March 10, 2021, Plaintiff reached out to Mr. Ringold over text asking about payment of the February 22, 2021, wages.

74.     On March 13, 2021, Plaintiff reached out to Mr. Chandler about payment for February 22, 2021.

75.     After no response, on March 14, 2021 Plaintiff texted Mr. Chandler whether he still had a job.

76.     Plaintiff then exchanged text messages with Mr. Ringold on March 14, 2021:

77.     Below is a true and accurate copy of text messages exchanged between Plaintiff and Mr. Ringold:

> Do I still have a job ?

Have you filed a claim?

> I have 2 more dr appointments

So I don't really understand your question. The question is are you able to work? The claim is about your in ability to work

> I'm just asking in general. Did you receive the email I sent from the neurologist? I can back to work but on light duty. Until April 2nd

> All of the doctors said I can go back to work but on light duty.  I still haven't received any pay for feb 22.  10 pm - 6 am.

I would say you cannot be paid by me and by my insurance company. It doesn't work that way

> Mr ringold.  The hours I worked that day come from the company , not the insurance.  Those are hours I worked for.  Prior to getting hurt. Workmans Comp isn't going to pay for hours I worked

I will verify the one days pay and work that out if it checks out with the Superintendent. But I think it best that we discontinue direct communication from now on as I feel like you are trying to take advantage and play both sides. If you cannot work file the claim if you can do your job I will talk. Not both

> I'm not that kind of person. But ok.

I read the safety reports and the reports from the other workers. To me this seems like you were negligent in protecting yourself and doing things unsafely. Sorry you hurt yourself but Then you ask for me to allow you to continue to work while you sue me... seems like you are exactly that person. Very disappointed

God knows the truth.  And I know the truth.  All of those reports are false.  God will prevail.

He always does that's a fact



This is unsafe. This is negligent. This is the hospital. Tyrone turned off the heppa filters while he was cutting the brick wall with the saw.
I put this is in my report when I worked on feb. 22. The Pipefitters complained about the heppa filters not being on because they couldn't start welding with all of the Brick dust. But I'm sure you never got this report. I sent this to Chris. Also there's proof on this picture that this was on feb. 22

Yet no one hurt themselves



Read 3/14/21

I sent you to OSHA 30 training to help protect the job site no make it unsafe



78.     Following this text exchange, Mr. Chandler informed Plaintiff that the Jesse Brown VAMC worksite had been shut down and there was no work for him.

79.     At all times material to this Complaint, Plaintiff performed to the legitimate expectations of Defendant.

80.     At all times material to this Complaint, similarly situated employees who did not report an injury, who were not Hispanic and/or had lighter brown skin and/or had not sought workers compensation benefits, were not refused work or denied pay.

81.     Beginning on or about March 8, 2021, and continuing, Defendant has refused to recall Plaintiff for any work, including the light duty office work offered on March 4, 2021, in retaliation for reporting his injury, seeking medical attention, refusing to recant his injury, as well as for his receipt of workers compensation as set forth in this Complaint.

82.     In the alternative, Defendant has refused to recall Plaintiff and deal fairly with regard to his workers compensation because of Defendant's prejudice against Plaintiff's Hispanic and/or lighter brown skin color.

83.     On and before October 10, 2020, Plaintiff had been employed by Defendant substantially more than 30 days.

84.     On and before October 10, 2020, Defendant had more than 25 employees but less than 500 employees for each working day during each of 20 or more calendar workweeks in the then current or preceding calendar year.

85.     On and before October 10, 2020, Defendant did not obtain nor did Defendant apply for an exemption from the requirements of the FFCRA from the United States Department of Labor.

86.     On and after October 10, 2020, Plaintiff communicated in writing that he was diagnosed and symptomatic with COVID-19 to Defendant, sent medical documentation of his COVID-19 diagnosis and stated the reason for the requested leave and the dates of the leave.

<u>**COUNT I**</u>
<u>**Failure To Pay EPSLA Paid Leave**</u>
<u>**29 U.S.C. 206**</u>
**Plaintiff v. Defendant**

1-86.   Plaintiff incorporates and re-alleges Paragraphs 1-86 of this Complaint herein this Paragraph of Count I of this Complaint.

87.     In October 2020, the Emergency Paid Sick Leave Act ("EPSLA"), Division E of the Families First Coronavirus Relief Act ("FFCRA"), Pub. Law 116-127 §§ 5101-5111 was in effect and modified the Family Medical Leave Act ("FMLA").

18

88.    At all times material to this Complaint, EPSLA Section 5102 stated in relevant part as follows:

(a) IN GENERAL.—An employer shall provide to each employee employed by the employer paid sick time to the extent that the employee is unable to work (or telework) due to a need for leave because: […]
(1) The employee is subject to a Federal, State, or local quarantine or isolation order related to COVID–19.
(2) The employee has been advised by a health care provider to self-quarantine due to concerns related to COVID–19.
(3) The employee is experiencing symptoms of COVID–19 and seeking a medical diagnosis. […]
EPSLA Section 5102, *et seq.*

89.    EPLSA Section 5102(b)(2)(a) entitled full time employees to 80 hours of paid sick leave at their regular rate of pay up to $511.00 per day or $5,110.00 in the aggregate for qualifying reasons specified in EPLSA Section 5102(a)(1)-(3).

90.    The week of October 10, 2020, Plaintiff contracted COVID-19 and was symptomatic and therefore was subject to a quarantine order propounded by the Illinois Governor.

91.    The week of October 10, 2020, Plaintiff tested positive for COVID-19 and was advised by his health-care provider to quarantine.

92.    Plaintiff qualified for paid sick leave beginning the week of October 10, 2020 through the end of his quarantine period and return to work on November 9, 2020, pursuant to EPSLA Section 5102(a)(1), (2) and (3)

93.    At all times material to this Complaint, EPSLA Section 5105 stated in relevant part the following:

(a) UNPAID SICK LEAVE.—An employer who violates section 5102 shall—
(1) be considered to have failed to pay minimum wages in violation of section 6 of the Fair Labor Standards Act of 1938 (29 U.S.C. 206); and
(2) be subject to the penalties described in sections 16 and 17 of such Act (29 U.S.C. 216; 217) with respect to such violation.

94.     At all times material to this Complaint, Plaintiff was a "eligible employee" of the Defendant within the meaning of EPSLA Section 5110(1), *et seq.*, and had been employed with Defendant at least 30 days.

95.     At all times material to this Complaint, Defendant was a "covered employer" within the meaning of EPSLA Section 5510(2), *et seq.*

96.     On October 10, 2020, through his return following COVID-19 quarantine on November 9, 2020, Plaintiff used over 80 hours of leave that was never paid.

97.     Plaintiff's rate of pay as of October 10, 2020, base rate of pay was $82.91 per hour.

98.     Defendant's failure to pay Plaintiff EPSLA Section 5102(a) paid leave was willful.

99.     As a direct and proximate cause of the Defendant's willful failure to pay Plaintiff EPSLA Section 5102(a) paid sick leave, Plaintiff sustained $5,110.00 in damages and has incurred attorney's fees and costs in this matter.

WHEREFORE, Plaintiff, respectfully requests this Court for judgment, against Defendant for $5,110.00, an amount of liquidated damages equal to the wages lost, prejudgment interest, plus reasonable attorney's fees, court costs and for whatever other relief this court deems just and appropriate.

### COUNT II
### Retaliatory Discharge and Refusal to Recall in Violation of the Illinois Workers' Compensation Act 820 ILCS 305/4(h)
### Plaintiff v. Defendant

1-86.   Plaintiff incorporates and re-alleges Paragraphs 1-86 of this Complaint herein this Paragraph of Count II of this Complaint.

87.     At all times material to this Complaint, Defendant was an employer within the meaning of the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1(a).

88. At all times material to this Complaint, Plaintiff was an employee within the meaning of the IWCA, 820 ILCS 305/1(b).

89. Plaintiff engaged in the following activity protected by the IWA:

   a. Reported his injury sustained while working for Defendant on February 24, 2021;
   b. Sought and obtained first aid for his injury sustained on February 24, 2021;
   c. Accurately reported the extent of the injury as discovered through additional medical treatment rendered by Dr. Kozlova;
   d. Began a course of medical treatment for his injury sustained on February 24, 2021;
   e. Filed an Application for Adjustment of Claim (Application for Benefits) with the Illinois Workers Compensation Commission on March 5, 2021 for his workplace injury sustained on February 24, 2021;
   f. Attempted to secure payment for medical treatment required for his workplace injury sustained on February 24, 2021;
   g. Attempted to secure temporary total disability benefits for the period which he was unable to work, excluding the first three days of temporary total disability, for injuries sustained in the workplace accident of February 24, 2021;
   h. Attempted to secure payment of injury permanency benefits for the injuries sustained in the February 24, 2021 workplace accident;
   i. Filed an Application for Adjustment of Claim (Application for Benefits) with the Illinois Workers Compensation Commission on March 24, 2021, for his contraction of COVID-19 on October 8, 2020;
   j. Attempted to secure payment for medical treatment required for his workplace injury sustained on February 24, 2021;
   k. Attempted to secure payment for medical treatment required for his workplace contracted COVID-19 that was contracted on October 8, 2020;
   l. Attempted to secure temporary total disability benefits for the period which he was unable to work, excluding the first three days of temporary total disability, for his workplace contracted COVID-19 that was contracted on October 8, 2020;
   m. Attempted to secure payment of injury permanency benefits for the injuries sustained for his workplace contracted COVID-19 that was contracted on October 8, 2020;

90. At all times material to this Complaint, 820 ILCS 305/4(h) stated as follows:

It shall be unlawful for any employer, insurance company or service or adjustment company to interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him or her by this Act or to discriminate, attempt to discriminate, or threaten to discriminate against an employee in any way because of his or her exercise of the rights or remedies granted to him or her by this Act.

It shall be unlawful for any employer, individually or through any insurance company or service or adjustment company, to discharge or to threaten to

discharge, or to refuse to rehire or recall to active service in a suitable capacity an employee because of the exercise of his or her rights or remedies granted to him or her by this Act.

91.     On March 8, 2021, Defendant discharged Plaintiff and refused to recall Plaintiff thereafter in retaliation for his activity protected under the IWA in violation of 820 ILCS 305/4(h).

92.     On March 8, 2021, Defendant withdrew an offer of light duty and/or office work made to Plaintiff in retaliation for his activity protected under the IWA in violation of 820 ILCS 305/4(h).

93.     Defendant also refused to timely pay Plaintiff for 8 hours of work from February 22, 2021, in retaliation for his activity protected under the IWA in violation of 820 ILCS 305/4(h).

94.     As a result of Defendant's discharge and refusal to recall, Plaintiff has sustained pecuniary damages and non-pecuniary damages, including but not limited lost wages and benefits, emotional distress, and loss of reputation.

95.     Defendant's wrongful conduct was egregious and merits the imposition of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

a.  Judgement against Defendant for Plaintiff in an amount sufficient to fully compensate Plaintiff for all non-pecuniary damages sustained, including but not limited to full compensation for his emotional distress, mental anguish, humiliation and loss of reputation;

b.  Judgement against Defendant for Plaintiff in an amount sufficient to fully compensate Plaintiff for all pecuniary damages sustained, including but not limited to front pay, back pay, lost income and benefits

c.  Judgement against Defendant for Plaintiff for punitive damages;

    d.   Judgement against Defendant for costs incurred by Plaintiff prosecuting this action;

    e.   Judgement against Defendant for Plaintiff for pre-judgment and post-judgment interest at the highest rate permitted by law; and

    f.   Any and all other relief that this Honorable Court may deem just and equitable.

## COUNT III
## Disparate Treatment (Race/Color) in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981
### Plaintiff v. Defendant

1-86.   Plaintiff incorporates and re-alleges Paragraphs 1-86 of this Complaint herein this Paragraph of Count III of this Complaint.

87.    In September 2020, Plaintiff was subjected to disciplinary action for answering a question on the worksite, and was subject to worse working conditions, including being sent home early and working without assistance because of his Hispanic race and lighter brown skin color as set forth herein this Complaint which constitutes a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1981(a).

88.    On or around November 30, 2020, through the third week of December 2020, Defendant maintained the rate of pay of Mr. Easter and adjusted Plaintiff's rate of pay downward from $82.91 to $57.38 per hour because of Plaintiff's Hispanic race and lighter brown skin color as set forth herein this Complaint which constitutes a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1981(a).

89.    Plaintiff was required to work in unsafe working conditions, including inhaling brick dust, working without assistance causing his muscle to be pulled and struck with hammer due to Mr. Robinson disregarding the safety of Plaintiff because of Plaintiff's Hispanic race and lighter brown skin color as set forth herein this Complaint which constitutes a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1981(a).

90.     On March 8, 2021, Defendant terminated Plaintiff because of his Hispanic race and lighter brown skin color as set forth herein this Complaint which constitutes a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1981(a).

91.     Defendant's conduct has been intentional, deliberate, willful and conducted with disregard of the rights of the Plaintiff.

92.     By reason of Defendant's discriminatory employment practices based upon race and color, Plaintiff has experienced emotional distress, humiliation, mental anguish, loss of compensation and employment, and as such, is entitled to all legal and equitable remedies available under the Civil Rights Act of 1866.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

a.   Judgement against Defendant for Plaintiff in an amount sufficient to fully compensate Plaintiff for all non-pecuniary damages sustained, including but not limited to full compensation for his emotional distress, mental anguish, humiliation and loss of reputation;

b.   Judgement against Defendant for Plaintiff in an amount sufficient to fully compensate Plaintiff for all pecuniary damages sustained, including but not limited to front pay, back pay, lost income and benefits

c.   Judgement against Defendant for Plaintiff for punitive damages;

d.   Judgement against Defendant for Plaintiff for the reasonable attorney's fees and costs incurred by Plaintiff prosecuting this action;

e.   Judgement against Defendant for Plaintiff for pre-judgment and post-judgment interest at the highest rate permitted by law; and

f.   Any and all other relief that this Honorable Court may deem just and equitable.

<u>COUNT IV</u>
**Hostile Work Environment Claim in Violation of the Civil Rights Act of 1866, 42 U.S.C. §
1981
Plaintiff v. Defendant**

1-86.    Plaintiff re-alleges and restates Paragraphs 1-86 of this Complaint as if set forth

fully herein this Paragraph of Count IV of this Complaint.

87.    Defendant discriminated on the basis of Plaintiff's lighter brown skin color and

Hispanic race by perpetuating a hostile work environment based on his color and race and refusing

to remedy complaints of discrimination based on race in the workplace.

88.    By the above actions, but not limited to the same, Plaintiff was subject to pervasive

and continuous unwelcome harassment at the hands of Defendant's manager Mr. Robinson, in the

terms conditions and privileges of employment because of Plaintiff's lighter brown color and

Hispanic race.

89.    At all times Mr. Robinson had been acting within the scope and authority of her

agency of Defendant.

90.    This harassment was offensive to a reasonable employee and Plaintiff was

offended.

91.    Defendant knew of the harassment and failed to take prompt remedial action to stop

and correct the same.

92.    When Plaintiff came forward with his complaints about his discrimination, he was

ignored.

93.    By the above actions but not limited to the same, Defendant created an intimidating,

hostile and objectively offensive and dangerous work environment, which unreasonably interfered

with Plaintiff's work performance, and seriously affected when Plaintiff was ultimately injured

due to the racially motivated disregard of Plaintiff's safety by Mr. Robinson.  Ultimately, Plaintiff

was terminated because of his lighter brown skin color and Hispanic race in conjunction with his attempt to secure workers compensation benefits.

94.     Similarly situated employees to Plaintiff who were not of a lighter brown skin color and not Hispanic who were not subject to the same or similar treatment.

95.     Plaintiff has suffered significant damages as a result of the above acts, including mental and emotional distress, embarrassment and humiliation, damage to his reputation and attorney's fees and costs. The exact amount of Plaintiff's damages are to be proven at the time of trial.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

a.    A declaratory judgment that the employment practices challenged herein are illegal and violative of the rights secured to Plaintiff;

b.    Judgement against Defendant for Plaintiff in an amount sufficient to fully compensate Plaintiff for all personal damages sustained, including but not limited to full compensation for his emotional distress, mental anguish, humiliation and loss of reputation;

c.    Judgement against Defendant for Plaintiff in an amount sufficient to fully compensate Plaintiff for all pecuniary damages sustained, including but not limited to front pay, back pay, lost income and benefits

d.    Judgement against Defendant for Plaintiff for punitive damages;

e.    Judgement against Defendant for Plaintiff for the reasonable attorney's fees and costs incurred by Plaintiff prosecuting this action;

f.    Judgement against Defendant for Plaintiff for pre-judgment and post-judgment interest at the highest rate permitted by law; and

g.   Any and all other relief that this Honorable Court may deem just and equitable.

## COUNT V
### Failure To Pay Wages In Violation Of Illinois Wage Payment And Collection Act ("IWPCA"), 820 ILCS 115, *et seq.*
### Plaintiff v. Defendant

1-86.   Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1-86 of this Complaint above as if fully set forth herein this Paragraph of Count V.

87.   At all times material to this Complaint, Defendant was an employer of the Plaintiff within the meaning of the IWPCA, 820 ILCS 115/2.

88.   At all times material to this Complaint, Plaintiff was an employee of Defendant within the meaning of the IWPCA, 820 ILCS 115/2.

89.   56 Ill. Admin. Code Section 300.630(d) required Defendant to notify Plaintiff of any change to his rate of pay in writing prior to the date of the modification, where not "impossible".

90.   On or about November 30, 2020, Defendant reduced Plaintiff's rate of pay from $82.91 per hour to $57.38 without notice in writing.

91.   It was not "impossible" to notify Plaintiff in writing to the change in the rate of pay prior to the effective date of the reduction in pay.

92.   Plaintiff was paid $57.38 per hour for all hours worked from on or about November 30, 2020 through around the third week of December 2020 at the Danville, IL worksite.

93.   Plaintiff did not assent to the change in the rate of pay and disputed it as soon as he discovered he was being paid at the reduced rate.

94.     Defendant failed to pay wages of $25.53 per hour to Plaintiff for all hours worked at the Danville, IL worksite from around November 30, 2020, through around the third week of December 2020, in violation of the IWPCA.  820 ILCS 115/2.

95.     Under the IWPCA, 820 ILCS 115/5, Defendant was required to pay Plaintiff his wages as final compensation, including wages of $25.53 per hour to Plaintiff for all hours worked at the Danville, IL worksite from around November 30, 2020, through around the third week of December 2020, at the time of separation, or at the next regularly scheduled pay day.

96.     Defendant violated Section 2 of the IWPCA by failing to timely pay Plaintiff for 8 hours of work performed on February 22, 2021, and by withholding payment to coerce him to stop his protected IWCA activity.

97.     Defendant violated Sections 2 and 5 of the IWPCA by failing to pay Plaintiff the wages of $25.53 per hour to Plaintiff for all hours worked at the Danville, IL worksite from around November 30, 2020, through around the third week of December 2020, either as wages or as part of his final compensation.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant, for the following:

a) Actual damages in the amount of wages of $25.53 per hour to Plaintiff for all hours worked at the Danville, IL worksite from around November 30, 2020, through around the third week of December 2020;

b) 5% of the amount of underpayments for each month following the date of payment during which such underpayment of the final compensation remains unpaid pursuant to 820 ILCS 115/14;

c) Reasonable attorneys' fees and costs of this action pursuant to 820 ILCS 105/14; and

d) Such other relief as this Court deems necessary and just.

**JURY TRIAL DEMANDED FOR ALL PERMISSIBLE COUNTS.**

Respectfully submitted,

By: ___/s/ Nicholas Kreitman___
         Nicholas Kreitman
         Plaintiff's Attorney

Nicholas Kreitman
Kreitman Law, LLC
22 West Washington Street
15th Floor
Chicago, IL 60602
Attorney ID # 6313283
(312) 332-1400
njk@kreitmanlaw.com